Good afternoon, Your Honors. Dennis Reardon appearing on behalf of Appellant Nosal. We meet at an unusual historical moment when both conservative and liberal judges on the Supreme Court have joined in bemoaning, and I quote, the deeper pathology in federal criminal law in the Yates case. And when both Republican and Democratic legislators are preparing bills to attack the over-criminalization of conduct that, albeit be undesirable, is better remedied by means other than the criminal law. Yet today this panel is called to decide upon whether two federal statutes, the CFAA and the Computer Fraud and Abuse Act and the Economic Espionage Act, should be interpreted in an unprecedented and radically expansive manner that would criminalize relatively minor misappropriations of information. To accept the government's position on either the CFAA or the EAA is bad law, bad policy, and would aggravate the plague of over-criminalization that the courts and legislatures are now struggling to ameliorate. I begin with the CFAA, which, as this Court sitting unbanked in what I'll call Nosal 1, held is an anti-hacking statute directed at the circumvention of technological barriers, not at the misuse of information obtained from a computer. The unbanked opinion also ruled that the terms of the CFAA, which would include without authorization, must be read consistently throughout the Act. The same reading applies to the misdemeanor provisions as applied to the felony provisions. So that's the meaning that this Court is going to define today. The government's position on the CFAA is there should be a bright line rule. All password sharing, all consensual password sharing that leads to an entry into a computer without the consent of the computer owner or in violation of the computer owner's policy is, quote, without authorization, and therefore is a crime, always is a crime under the CFAA. It could be a misdemeanor under 2CA or a felony under Section, I believe it's D, that we're dealing with, or 4 that we're dealing with here, but it's a crime. And we know two things. One, we know that that reading of the CFAA was not contemplated by Congress when it passed the CFAA in 1984, because in 1984 there were no connected computers. It wasn't like the world today where hundreds of millions of people have password accounts to their Facebook accounts, to their Instagram accounts, to their business, their banking records, their home computers, their work computers. So we know that this issue, this criminalization of password sharing, was not on the mind of Congress in 1984. And we know today Congress would never, ever pass a statute with that definition of without authorization. And I think the best evidence of that is the amicus brief of the Software Foundation, a coalition that's before this Court. And what they point out is that that technology, as it often does, has outstripped, in this case, the government's understanding of criminal law, because cloud computing relates, relies very, very heavily on shared passwording, sharing of consensual sharing of passwords by the account holder. That all of these devices intended to protect a person's privacy, intended to protect their financial security, depend on the account holder of an account at a bank giving its applications in the cloud, which then checks on the account. The bank does not consent to it, and it probably is in violation of their policy. But to criminalize that password sharing, as the government would do, is to turn literally millions of honest citizens who are using these devices into criminals. May I direct your attention to the specifics on this case? Yes. I know, I appreciate that you've characterized it as password sharing on a broad scale, in terms of how you've framed the case. But if you take yourself back to the Brecca case, where we also considered what does without authorization mean, in the Brecca case, the Court said that without authorization, and in that case it was an employer and employee context, where the employer has rescinded permission to access the computer and the defendant uses the computer anyway, that's without authorization. So my question is really twofold. Is there any doubt that the company here revoked or rescinded Mr. Nassau's permission? And how do you square this situation with Brecca, which we said in Nassau 1 we were building on? Well, Your Honor, in fact, this would be a terrible case to apply the government's rule because of the facts of this case. Peter Dunn, the general counsel of KFI, the party claiming a breach of the searcher database, testified under oath that Mr. Nosel was permitted to ask KFI employees to provide him with any and every piece of information in the searcher, KFI searcher database. That's at ER 720, 722 at 1033. Their understanding was that he could get anything he wanted out of the searcher database by asking a KFI employee to give it to him. Now, the understanding that he was related to his ongoing, you're talking about now after he leaves the company and he's an independent contractor. Right. Related to the searches he was doing, correct? Exactly, Your Honor. Now, of course, Dunn's point was he wasn't supposed to misuse that information. But the point of Nosel 1 is that the CFAA is an anti-hacking statute, not a misuse statute. We'll come to whether that was misuse and could be criminalized under the trade secret statute. But the fact of the matter is we're dealing with a case in which, as far as KFI was concerned, he could ask anybody to get anything he wanted out of searcher and, you know, they had an understanding of what we'd be doing it. And in fact What about his cohorts, Jacobson, Christian, is it Christian and Jacobson who are working with him? Their authorization had been terminated, correct? Yes. They had left the company. And it was them who was going in and asking the assistant for her password so that they could access information, correct? Right. They were asking her to share a password so that, well, in some instances she goes in and they actually download the information. But the fact of the matter is that we all agree on this. If Mr. Nozol had called, had directly called Ms. Frey-Leclerc and said get me the information at issue in counts 2, 3, and 4, no CFAA violation. That's Nozol 1. But the entry here and the obtaining of information for someone who the company said could obtain the information was no different in extent, the nature of it, the Ms. Frey-Leclerc actually did herself perform, which were What I'm having some difficulty with is that basically everybody knows that they're going through the back door to get what they can't get through the front door. They don't work there anymore. Their authorization has been revoked. So they get the assistant to give them the password. And she even admits she can't understand how to get some of this stuff herself. So they go in with the password, right? Why isn't that with authorization? There's no disagreement on the facts. What Judge McKeon said is absolutely correct. The question is, is that a crime? They were not allowed to use their authorization, and they didn't use their authorization. They asked somebody else to give them a different authorization to share it, and it's going through the back door to get what you can't get through the front door. That's all correct. The question is, is that a crime when your authorization has been revoked and you can't do it? Is it a crime to go to someone else in the company and ask them to share their password with you? There's no disagreement on the facts. The question is whether it should be a crime. I agree. And I am not here to defend the conduct. No, I understand that. We're talking about whether it's a crime, and we'll get to the EAA, but under the CFAA. And my point is that the Court cannot find that is a Federal crime without finding that consensual password sharing is inherently a crime under the CFAA. Well, you spin out a lot of hypotheticals, but it's not a question of consensual password sharing. It's a question of who has the authority to give authorization. So let me just ask you under the statute. Let's take this. Let's say we've got some Russian spy agent, right? He gets involved with a honeypot situation with an executive assistant in some company. It doesn't have to be KFI. It's some company. And so he kind of sweet talks her into he has no authorization to get into the company's Okay, well, I'll give you my password. And then he goes in. Crime or no crime? Crime? Very possibly. Under the CFAA, no. No. And why no crime under the CFAA? Because the secretary, the person, has the authorization to enter there. And if someone else gets in through a consensual and agreed-upon use. But to that, doesn't it beg the question of what's authority? I mean, you have some guy or female or guy who's the janitor, and a lot of them have access and e-mail accounts. So it means that anybody has the authority to give anybody else their password, and therefore, under your construct, you could never have a crime. No. You can have lots of crimes. But you can't have this crime. You can't have this crime. That's right. Can the Court indulge a hypothetical? I know you're trying. But hypotheticals count when we're talking about the abstract definition of the statute. Well, they do. It depends on how we make it. I don't know that you were here for the beginning of our arguments, but it could be that both sides are a little bit wrong about how they construe the statute. So we don't – so I appreciate and I want to hear the hypothetical, but it all depends on how you construe authorization, doesn't it? Well, and you – what is being said and what the Software Coalition says is that you can't define shared password entries or consensual password entries in a sharing context as – define it as without authorization. And, you know – Well, why can't that form part of the element? I mean, you're arguing it can never. The government seems to be arguing it always can. Right. Well, why can't it form part of the proof of the element of obtaining access without authorization? Well, generally and in this case, the reason it can't generally is that perhaps we need a statute that's in between those two views, but Congress hasn't written it. And secondly, if the Court came up with that kind of formulation, it would have to reverse this conviction because certainly the elements, the new elements that we're framing to come up with a view between one view and the other were not placed for the jury and found to be elements of these offense. Well, why can't one, for example, construe circumventing a technological barrier as including consensual passwords? I mean, in Nozzle 1, we said we focused on hacking. We focused on technological barriers, but obtaining a consensual password can, it seems to me, form the idea of circumventing a barrier. Here's why. We've got two women employees at Leviathan, one of the major head hunting companies in the world. They're named, well, let's say Carly and Hillary. Right. Both have passwords that give them access to the database. Right. On a particular day, Carly calls Hillary and says, you know, I don't have my laptop. I'm out of the office. Can you get me some information out of the database? Sure. Or give me your password. I'll get some information out of the database. She gives her the password. The point is that they share a password, and it's absolutely prohibited by company policy. But they go ahead and do their work. Now, the company is never going to complain about that until Hillary, or as Judge Kaczynski pointed out in the en banc opinion, Hillary or Carly complains about sex discrimination, at which point the company is going to say, you people committed a CFA violation because you shared your password and you better quit. You have to write a ‑‑ if that should not be a CFA violation, you have to define without authorization in such a way that that's not without authorization. But the authorization, the ‑‑ if you have a very clear revocation of authorization, it may be a factual question where the jury says, well, there is authorization because they're working in the same group and Hillary and Carly have gotten together now and joined forces and they're working in the same group and they need the information, she's on the road, and that is sufficient authorization. And NOZIL 1, we're not going to rely just on, quote, company policy or some handbook that's written and stocked away. So why can't you look at the facts? But, you know, you're dealing with a situation on the facts here that the information that Mr. NOZIL received was actually information that he was permitted to receive for one purpose as opposed to another. But the way he got it, I mean, the way he got it was to go through the back door. And everybody knew that. I mean, why do they go to the assistant? Because they can't get the information. No, no. He could have ‑‑ in five instances they called Ms. Frelick and she directly produced the information. And the Court said that might be some other offense, but it's not a CFA violation because we're not concerned. We're concerned with anti-hacking here and not misuse of information. Right. But would you agree that a password is a form of a technological device that companies and others use to prevent unauthorized entry? Yes. And if you steal it, that would fit with our ‑‑ that's a violation of the CFA. Because it's not consensual. If you bribe somebody to get it, they're guilty of the separate CFA statute for trading in passwords. They're also guilty of fraud under, you know, under the general fraud statutes. Or if it's the result of a consensual sharing because of phishing. Some phish that they get there on their computer. In other words, they're duped into giving their passwords. They consensually give their password out to a third party who has malicious intent, but they do it voluntarily and unknowingly. Third party still, I think, under the statute. Well, I don't disagree. Under your theory, the Chinese aren't responsible for OPM breach. No, that's not true. That's not true. Well, why not? Because defrauding someone and deceiving them is not a consensual use of the password. If we're dealing with the facts here, that's a hypothetical that's on another side of the line completely. Well, did you give the hypothetical you wanted? Yeah. I just want to make sure you got to it, because otherwise you'd be anxious. I'm not sure quite that you answered why BRCA doesn't apply here, saying that if the employer has rescinded permission, which we know they have, or it has with respect to Jacobson and Kristen, why isn't that unauthorized? Well, that's the thing. If they go in with his, you know, conspiracy to do this, that they go in, they know they don't have access or authorization, but they do it anyway. Well, if we're going to – the problem with that is that Mr. Nozol does have the permission to receive this information. So predicating his criminal liability on theirs in a situation where he's getting information that KFI said he could have, I think, is an issue that certainly wasn't dealt with below and would involve a formulation of the statute that would entitle him to be retried under the new definition or the defining of it that comes up. Your Honors, there are some really significant trade secret issues here. And I want to – and I'm two minutes away from the end. Yeah, go ahead. Let me make one point before I turn to them, which is this. If the Court were to find that the definition – there's a flaw in the definition under the CFAA and, therefore, a flaw in the CFAA prong of the Count I conspiracy, it has to reverse all five of the substantive counts without even getting to the trade secret count. And the reason for that is that the government, in its brief here at page, I believe it's – I'll get this site – 25, says that under the Pinkerton Doctrine, Mr. Pinkerton's claim that all substantive offenses could rest simply on its conviction of the Count I conspiracy, the government below argued to the jury that if you convict him of Count I, he's guilty of all substantive offenses, trade secret as well as CFAA. And we specifically said to the Court below, you might want to settle the government from itself, because it's asking for a Pinkerton theory. And if there's any defect in the Count I conspiracy, then all of the substantive counts have to go. But let's turn to trade secrets now, because it's very – We'll give you five minutes on trade secrets and we'll give the government an extra five. Absolutely. So let me deal with the biggest problem, because it's huge. It's coming up before this Court in a case called Lew that's pending here as well. The government's position is that, on trade secrets, is that it doesn't have to be secret, as we've understood that. In United States, in Ruckelshaus v. Montesano, the Supreme Court said, if you disclose information to a third party, either without a confidentiality agreement or one that's expired, it is not a trade secret. Their position is that they did not have to prove that these source lists had been either sold or distributed as part of what they call shootouts, beauty pageants, and so forth. All they had to prove is that the company continued to take reasonable measures to protect them. So their view of that guts Monsanto. They are saying that under the EEA, something does not have to be secret, as it's traditionally understood in trade secret cases. That is, hasn't been sold, hasn't been given away without a confidentiality agreement. They never attempted to prove actual secrecy to the government, to the jury. They never argued the Monsanto principle. But could I just ask a point on that to understand where I read this? And maybe I misunderstood. I had understood that in these so-called beauty contest situations that there was a confidentiality understanding. Was there testimony on that or no testimony? There was the beauty pageants, you're not, you don't have a client, okay? You're talking to somebody who has no contractual obligations to you at all. There was testimony that said that often there was confidentiality agreements. There was no effort to prove that these lists were ever subject to a confidentiality agreement or to prove that they hadn't been handed out at shootouts or sold as part of a mapping obligation. And the government's attempt to reconstruct evidence of actual conspiracy here on appeal is actually quite misleading for two reasons. One, they say that, never cited to the jury, that Marilyn Briski said that these lists had not been given out. She said nothing of the sort. The government said Marilyn Briski's description of searches is speculative because she hasn't done it for 25 years. We cite that in the brief. They then ask her, were these lists given out? And she says, I have no information on that question. It's like asking her, you know, have the Giants won the World Series in the last 10 years? I don't follow baseball. I have no information. And that is not evidence that it didn't happen. That is the evidence that they rely on. And secondly, they say that we don't contest that when, in fact, as in our reply brief and on our new trial motion, we hammered at them in the opposition reply brief on the new trial motion for misstating the evidence because she they said again, she said they hadn't been released when she wouldn't have known. She wasn't a search person for 25 years. And secondly, she didn't say they hadn't been released. She said they didn't – she didn't have any information on the subject. Very quickly. Kagan. What would be the practical effect of reversing on the trade secret charges? Well, you – if there was no – if the trade secret counts, including the trade secret prong of the conspiracy count, are defective, then you have to reverse on the CFAA counts as well because the government's argument is that if you convict of conspiracy, all counts, all five substantive counts have to go. One really important point on this. The government says that – we say they didn't offer any evidence that any of these people knew what a trade secret was. And the Court instructed on the substantive counts they have to know what a trade secret is, even on the conspiracy count where it said they have to have a firm belief. The government says, no, no, ignorance of the law is not a defense. The truth of the matter is ignorance of the law is the defense when knowledge of some aspect of the law is an element of defense, as it was in Liperada. No one can – that mens rea requirement was put in there to protect the unwitting. You have to have a knowledge, as the Supreme Court said in Cheek, if you don't know what – that a statute exists or the content of it or you misunderstand it, you can't be found guilty of knowing that you have a duty under it. And it is simply disingenuous for the government to say when an element of defense is knowledge of a legal status, trade secret status, that there is no – it has no obligation to prove that the defendant actually knew anything about the nature of trade secrets. And one thing about this case is all people agreed that Mr. Nozell didn't know anything about search. He never used it. He relied on other people to do it. It has a pop-up that says stuff in here is secret. He never saw it. He never used it. He – so there's a very compelling argument. But he did know. He didn't have to know how to get it out, but he did – you're not going to suggest that he didn't know that the kind of information that you can extract in which he used while he was there included some things that might be public domain mixed with internal phone calls, notations about a particular – he did know the nature of the material. He certainly knew that – put it this way. They had evidence that he knew that the KFI considered the information searcher to be confidential, but confidential information isn't trade secret information. The element of the offense is not – you have to know that the company would view something as confidential. You have to know it's a trade secret. Thank you, counsel. Thank you very much. And our – we'll give an extra five minutes to the government. May it please the Court. Jenny Ellickson for the United States. Since the Court was just discussing the trade secrets issue, I'll start with that. I'd like to clarify one thing right out of the gate, which is that the government has never taken the position that we did not have the burden of proving that these – the source listed issue were trade secrets for purposes of the substantive counts. And that burden required us to prove not only that the government – that the company took reasonable measures to protect those trade secrets, but also that those trade – the source lists got – had independent economic value from not being generally known to or reasonably ascertainable by the public. We do not run away from that burden. The only question before the Court is whether the evidence in this case was sufficient to establish that element and whether the jury – whether a reasonable jury could conclude that the source list did in fact derive independent value from not being generally known by and reasonably ascertainable by the public. No. Did you only have to show that it wasn't generally known, or did you have to show that you had not disclosed it to customers or potential customers? You hadn't disclosed it to anyone in the public. So the statutory definition of trade secrets is that, with respect to this prong of the definition, that the information derives independent economic value, actual or potential, from not being generally known to and not being reasonably ascertainable through proper means by the public. So it's not generally known to. There's no requirement that – Generally known to or not reasonably ascertainable. Or readily ascertainable through proper means by the public. Were given to other people without any confidentiality requirement, would that be – would that defeat the defense, or would that – would you then be able to say, yes, we gave it to customers, but that's not available to others, even though the customers are free to disclose it to other people? I think in that hypothetical situation, it would be difficult to prove that prong. That's not what we have in this case, though. In this case, there was no evidence presented that any of the source lists that issue in counts five or six were disclosed to anybody other than people within the company. So what portion of the source list derives purely from private information? I'm not sure I understand. The source list is a compilation of information, some of which – That's some public and some private. So what portion of the source list that issue in this case came from purely non-public sources? Your Honor, it's not entirely clear. Some of the information certainly is available, publicly available. Other information on the source list, such as cell phones, the witnesses at trial testified that that was generally not information, cell phone numbers, that they could obtain through public sources. But the question – So we have cell phones, anything else? I think there also may have been home phone numbers also on these lists. So we're just talking about telephone numbers? Yes. But except that the source list – it's not just a list of telephone numbers. What the list actually captures is the work done to determine who would be potential candidates for a particular type of position in a particular type of industry. So – and these industries can be fairly narrowly focused, and the positions can also be fairly narrow. So, for example, who would be a good chief financial officer in a medical device field? And there is – there was no testimony about there being a publicly available source from which you could get a compilation of all of the potential candidates to fill that type of job. So even though the information was drawn from some of it from public sources, the way it was combined by Korn Ferry, the victim in this case, gave it independent economic value. So the statement you made earlier, though, does conflict with what Mr. Reardon suggested to us. You said that there's no evidence that these sourcing documents had been disclosed outside the company. Yes. And so I'd like to – let me drill down on what, you know, I think where it is. Because what he's saying, of course, is that it was known that, you know, you go out to these potential clients and you'd want to show how great you are, like, of all the possibilities of people you have. And so you show them your list, which I have here. Yes. So Mr. Reardon is referring to more general testimony about what sometimes happened during pitches. And I think if the Court looks at the citations to that testimony, what the witness has testified to is that in pitches they would sometimes compile lists of sample potential target candidates, that for the most part these pitches did not involve the disclosure of source lists, that instead it was other types of information that also potentially came from searcher. But what matters in this case is not, you know, what the Corn Ferry's general practices were with respect to other source lists. What matters is what the evidence was with respect to the source list at issue in this case. And there was no evidence that the source lists at issue in this case were ever used in pitch meetings. And I'd like to point to three pieces of evidence that the jury could rely on to conclude that these specific source lists were, in fact, even, that they were not generally known to the public. The first is Marlene Briskey's testimony. And Mr. Reardon says that Marlene Briskey is not capable of opining on this issue, but Marlene Briskey was one of the two people who headed up the investigation into the intrusion in Corn Ferry's computers. And so she, although she perhaps was not the best person to talk about what happened as a general matter during Corn Ferry pitch sessions, she was uniquely qualified to testify about what had happened with the source list at issue in this case, because her investigation was going into what had happened with these particular source lists. And so the fact that she said that as far as she knew, these source lists had certainly evidence that the jury could have credited. Second, and critically, Mr. Nosel's co-conspirator, Becky Christian, testified that she went into the searcher database to get these source lists because as far as she knew, they were not available from any other source. That's at excerpts of record 379 to 380. And Ms. Christian was a former partner at Corn Ferry. She was experienced in the search field. If she was unaware with her expertise in the area, if she was not aware that these source lists were available anywhere else, I think the jury could conclude that they were not, in fact, generally known by or reasonably ascertainable through proper means by the general public. And then finally, just the evidence about how much work went into the creation of these source lists, the measures that Corn Ferry took to protect them, all of that, again, confirms that these source lists were not the type of, they were not something that you could Google. They were something that required a great deal of work to put together and that was basically the centerpiece of Corn Ferry's business model. So one of Mr. Nosel's requests was to obtain a specific telephone number, right? That's not the basis for the trade secrets count, but that is one of the things that happened in this case. Yes. I was going to ask you, do you think that violated any trade secret or anything in this case? Just retrieving a single phone number? Yeah. That was a perfectly proper request? Well, I don't know that it was perfectly proper given that he was doing it through the method. But it was certainly not, his phone number was not a trade secret. Yes. No, certainly a phone number is not a trade secret. I agree with that, Your Honor. So your argument here is that really the algorithm that produces the information takes public data and makes it somehow a trade secret? It's not an algorithm, Your Honor. It's actually the result of work by employees within Corn Ferry. The testimony showed that these source lists were often, you know, source lists were used to create source lists again in the future. You would begin your search by pulling potentially relevant source lists. So when does publicly accessible information become a trade secret just because someone puts it, compiles it? If it's compiled into a unique combination, into a combination that is not readily ascertainable and that has independent economic value in that combination, then yes, Your Honor, public information compiled in a way that is not obvious can constitute a trade secret. But I hear that it was not just public information. There was stuff added by the Corn Ferry staff. Well, so the research department, I mean, the research department would supplement source lists by adding additional names. In addition, the database also contained, with respect to, you know, people that Corn Ferry had spoken to, it would contain that information. That was not part of what was downloaded. This comes up all the time in terms of customer lists. And there's a body of law that basically says a customer list where the public can figure it out probably isn't a trade secret. So tell me how this is different. Because this information was not readily ascertainable. And, in fact — That's the argument made in those cases, that it's the way we put the customer lists together, even though the information is all public. Yes, and, Your Honor, the — Distinction. So this is really — I mean, and, again, this is a sufficiency question, is whether the evidence was sufficient to allow the jury to determine this. And I think even just based alone on Becky Christian's testimony and her testimony about the conversations she had with Mr. Nozal about this, where they were discussing what they needed to complete those searches that were the focus of the April 12th downloads, and Mr. Nozal began talking to her about these are the specific source lists I need. He did not suggest that she could get the information by another means. And Ms. Christian testified that as far as she knew, there was no other way to get this combination of information. If this information was, in fact, if it was readily ascertainable, there would have been no need to go into Korn Ferry's computers to get it. I know that there are a number of other issues that I want to make sure to cover. Before you leave trade secrets, the jury instruction said the government need not prove the existence of actual trade secrets, goes on to say basically that the defendant knew it was a trade secret. But that seems to be at odds with how you started out to say the government didn't take the position that you didn't have to prove trade secrets. So maybe you can clarify what is the government's position. Yeah. My position, and I, if I was not clear about this, I meant to be clear that our position is that for the substantive counts, the counts 5 and 6, that we were required to prove that and that we were not required to prove that for the conspiracy count. Okay. Okay. Let's talk passwords. What I actually do, there is one other issue that I just wanted to touch on before I leave trade secrets, which is the ramifications of what would happen if this Court were to agree with Mr. Nozol with respect to the sufficiency on the trade secrets. That would require, if the Court found that those counts were supported by insufficient evidence, this Court would presumably reverse those two counts, counts 5 and 6, but it would not, there would not be a basis for reversing the other counts because there was still sufficient evidence with respect to the other counts. If you happen to have time left over after you discuss all these issues, maybe you can tell me why it was necessary to pay Melvin E. Myers almost a million dollars to recover $40,000 for your company. Why is it in a criminal prosecution that we have a U.S. attorney who is getting heavily paid to try to get that money back, that $40,000, that they didn't have the capacity to do it without paying a million to Melvin E. Myers in restitution? But that's only if you have time after you get through with all the other issues. I will give the Court a ten-second answer now, and then I will return to it if there's time at the end. The ten-second answer is that the government's loss estimate in this case was different than the estimate that the Court adopted, and our loss estimate, I think, was, it was over $400,000, and I think the company estimated that the source lists were actually worth $900,000, and the District Court did not adopt that, but I did just want to make that point. But we can talk more about restitution once we get through the 1030 issues. So I'd also like to clarify something right out of the gate on the without authorization issue, which is that the government is not asking the Court to adopt a bright-line rule that sharing a password constitutes, per se, access without authorization under the CFAA. It sounds like it, though, from your briefing. No, Your Honor. What we're asking this Court to do is to enforce BRCA. And what BRCA said is that in the employment context, you — if the employer has rescinded permission to use the computer and you use the computer anyway, you have acted without authorization under the statute. Enforcing that rule will not have ramifications outside of the employment context. It will not mean — You mean if he had not been an employee before and had done the same thing, it would have been okay? You know, I think that's a more difficult question under BRCA. I think BRCA says that — BRCA lays that two prongs, and we're clearly under the second prong. But it says if you were an employee and you were told you can't use your authorization, then that's — you know, that's one thing, you can't use your authorization. But if BRCA doesn't say if you don't use your authorization but somebody else gives you her authorization, you can't use that. I'm not sure if Your Honor is referring to the Leviathan hypothetical that Mr. Reardon raised during his opening about one employee. No, no. I was just talking about the facts. If you say to your employee, okay, you can't use your authorization anymore, and he doesn't use his authorization anymore, but somebody else gives him her authorization and says, you know, I'd like you to get something for me, is he committing a crime if he does that? Well, under BRCA, I think that would be without authorization because the — BRCA explains — well, actually, I should clarify that. BRCA explains that authorization depends on the actions taken by the employer. So first of all, we have to assume that the employer had taken action to prohibit — to revoke the access and also to clarify that access couldn't be shared with others outside the company. We have that here. Assuming that that's satisfied, then, yes, I think under the statute and under BRCA, if a current employee, without the authorization of the employer, shares her log-in credentials to her employer's computers with an outsider, that would be a without authorization access. But without authorization alone is not enough to make something a crime under Section 1030. You still need to satisfy the other requirements of the statute. Why? So, for example, you would — in this case, as the Court knows, there are fairly onerous requirements such as intent to defraud and obtaining something to further the fraud. I know — Not in Section 2. Yes. And I know that — I know, as the en banc court was concerned about Section 2 — Well, the en banc court said you have to give the interpretation you would give to Section 2. Yes. And we — So we can't look at Section 4. We agree. Okay. We agree. So what are the other requirements? So in Section 2C, which is the one that the Court focused on in the en banc opinion in this case, you have to have your — without authorization access be intentional. So that means that you have to know that you are not authorized to access that computer. That means that you have to know that the person who has shared their access with you, that that does not constitute proper authorization. That's in no cell now? This is in the statute. That's in the — you're talking about Section A2? A2C. And so just to read the relevant language of that provision, it's whoever intentionally accesses a computer without authorization or exceeds authorized access and thereby obtains information from any protected computer. So the mens rea requirement ensures that there's no danger that someone who is using someone else's password believing that that person — Why didn't you charge him under that? That seemed even easier than the one you did charge him under. He committed the offense under the intent to defraud provision. That's — yeah. Well, I mean, but could you have equally charged him under these facts, under A2? You know, Your Honor, I have not considered whether — I think perhaps, I think. So then the question is in the — what he was charged with. And even if we have to read consistently, he was charged with a specific thing about intent to defraud. Does intent to defraud do nothing? Because you could just go under A2 and then you wouldn't have to worry about that additional element, right? To the extent that the Court is looking to the mens rea requirement as a means of kind of determining what the — what without authorization means throughout the statute, yes. But I think that the A4 charging provision is a more serious provision. It's a felony provision. The A2C provision is a misdemeanor, I think, unless there's additional circumstances present. So — Well, one of the things that Mr. Nassau's counsel says, of course, is, all right, maybe these other two people might be, you know, scallions in terms of trying to access the information. But Mr. Nassau, because he was an independent contractor and he had some continuing clients that he was trying to place or find placements for, he actually had authorization. He just didn't do it directly. He did it indirectly. What is your response to that? So he had no authorization to access Korn Ferry's computers, and that's clear from the record. He, in fact, asked for permission to continue having access to his e-mail account and was denied that request. What he could do under the terms of his independent contractor evolving agreement with Korn Ferry is that for specific searches that he was still working on, he could ask certain Korn Ferry searches as well to get him information that was relevant to those searches. But having the authority to obtain information does not give you authority to access the computers on which that information may be stored. Did he have any authority for Ms. Froelich as to her being the employee that he could ask to get information? Well, the evidence showed that she was actually never the person he would turn to to get source lists. I think she may have been listed on some of the e-mails about the ongoing support he would get as somebody he could turn to for support generally. But she was not somebody. She testified that she never obtained source lists for people. It was not something she knew how to do. So if he had asked for this information specifically, he could have asked for it, right? I don't think he could have, Your Honor, because his authorization to obtain information was limited to information that was relevant to the searches he was working on. Was there testimony that this information, 5 and 6, et cetera, was not related to his specific searches? Yes. And, in fact, one of the source lists... I think your answer is yes, he could ask. Pardon? Yes, he could ask, but the company would not have given him permission. Right. And was there testimony specifically on that point? About whether he had asked? No, if he'd asked, whether the company would have given him permission. I can't remember if there was testimony about these specific source lists, whether they would have asked what would have happened. But you just told me that there was testimony that these source lists didn't relate to his searches. Yes. No. The reason I'm following up is Mr. Reardon said he could have gotten the information anyway, and there was testimony to that effect. No, there was testimony that he could get information that was relevant to his current searches. And I apologize for not having a perfect recall of what the testimony was about these specific source lists, but I believe the evidence showed that these source lists were not related to any of his ongoing projects at Corn Ferry. But he had asked for this information of the lady that he could ask for proper... And she had said, well, let me give you some more information. That would be a crime? Well, Your Honor, it wouldn't be a crime under Section 1030 because he wouldn't be accessing a computer without authorization. So the key here is that his co-conspirators, and that's another thing also just I'd like to point out, is he wasn't the one who actually did, you know, he wasn't even the person who used the password. It was his co-conspirators who had no authorization at all. So what do you do with the larger issue? I mean, he fits arguably in the BRCA situation, but the statute is the statute. So what do you do with the broader issue that is raised in amicus and other parts of the brief that you would, in effect, criminalize password sharing per se? Facebook, giving your husband or wife or spouse access to the bank account, that sort of thing. And we're not taking the position that... Well, what's the ramification of this statute and how we interpret it? So I think the question of what would happen outside the employment context is a fact-specific one. And this Court's opinion in BRCA is clear about what happens in the employment context, that it's the actions of the employer that determines whether someone has authorization. But outside the employment context, it's less clear what BRCA would require, whether BRCA means that only the computer owner has authorization or whether it could allow for other people, such as an account holder, to give... To go back to my question, if he hadn't been an employee who left, but had just been a competitor, can he ask for this? He wouldn't be committing a crime? Well, I certainly don't want to say that, Your Honor, because I think that... But you're relying on the fact of BRCA that he had been specifically told he couldn't have this authorization. Mm-hmm. But so I say, well, I want to see how important that is. And if he didn't, if that hadn't happened, then what? Are you really relying on the fact that he was told that his personal authorization was revoked? Is that the heart of your case? The only thing I'm asking this Court to do, yes, is apply BRCA. Right, but I mean, how can we limit BRCA to the employment context when it's not in the statute? Because BRCA addresses only the employment context. Well, I know that. That's not an answer. That was the question there. But if you take Judge Reiner, it's hypothetical, and you just have a third-party competitor, or, as I said, the Russian spy or whomever in the third party. Or Facebook saying you can't access Facebook anymore. Well, that's different. I'm not going to terms and conditions of use. I'm going only to an outside third party who has no authorization. Are you saying the statute wouldn't apply there? No, I'm definitely not saying that. What I'm saying is that. What's the limiting principle? What's the limiting principle? It can't be employment, because the statute is not an employment-driven statute. I mean, so I see that I'm over time. I hope I can still answer the Court's question. So what BRCA says is that BRCA refers to whether you have gotten permission granted by an authority. And so I think the question in these cases is whether as a fact, based on the facts of these specific hypotheticals, whether the person who shares their password is a person who constitutes an authority with the power to do so. And I think that inquiry is likely to be fact-specific. I don't want to suggest a bright-line rule that this Court should adopt that would apply and occupy the field, because I suspect that this is going to be more nuanced. Thankfully, the Court doesn't have to grapple with that problem here, because this case is on all fours with BRCA. Is there a testimony that Ms. Froelich did not have authority to permit her password to be used outside the company? Yes. She testified that she knew she was not authorized to share her password. Who had the authority? You have a global corporation. What was the testimony on who was the person who gave the authority? So there was the Corn Ferry had kind of an IT policy that explained how everything worked with passwords. It included the restrictions on password sharing. But who had the authority? I think the jury could infer from the existence of this policy and the fact that it was issued by the IT department that the IT department perhaps I think that some companies would be stunned to hear that argument. You know, I mean, maybe Mr. Snowden's cousin's brother's sister's husband in the IT department can give authority. So maybe you want to rethink that. You're correct, Your Honor. I'm just saying, I'm not sure. So maybe the different question, who revoked his authorization here? That was the IT department. Well, the IT department revoked his authorization on orders from From whom? I think they said that they, I'm not totally sure of the testimony. I think they said they had gotten the information from human resources. So HR is now the Your Honor, It's actually an important question because if we're saying without authority, shouldn't we be concerned with who had the power to give authority? Again, we're writing on a broader canvas than we are on this case. Yes, I think the question of whether someone is the person with the authority to grant permission, I think that is a significant question. But there's no doubt that there was someone at Corn Ferry who determined who was allowed to have passwords to access the system, and someone at Corn Ferry who determined that the defendant and his co-conspirators, Becky Christian and Mark Jacobson, should no longer have passwords. And I think that you can definitely say that the passwords are evidence of Corn Ferry's corporate decision about who should or should not have access. I know that I'm well over time. There was one small issue I wanted to address that I haven't had time to address, but I understand if the Court You can address it, but Mr. Reardon is going to get equal time. Yes. That's totally understood. I did want to just address also Mr. Reardon's contention that ruling in Mr. Nosel's favor on the 1030 counts would wipe out all of the counts. That's not true. As a matter of law, sufficiency, if there's insufficient evidence as to one basis of a conspiracy, it does not. But you can sustain the conspiracy on a separate basis. You can still sustain the conspiracy. And I'd also just like to note that for Count 6, although the government's brief did not point this out, Count 6, all the allegations charged in the indictment and the evidence of this case showed that Mr. Nosel was the principal in committing that crime. There was no Pinkerton liability for that crime. That was a principal crime. No liability? No. So the jury, the evidence would not have supported a finding of Pinkerton liability on that count because it was Mr. Nosel was the principal. Thank you very much. You get four and a half minutes. Well, principally, citations to the record. ER 622, Peter Dunn says that Mr. Nosel was entitled to get any information in searcher. There was no screening process. They may not be in the excerpts of the record. If you look at Exhibit C, D, I, J, K, they were all source lists that he had asked for and were readily given to him. Nobody screened it. There was no testimony to support the notion that there would have been a screening process under which these particular source lists would not have been given to him. But did he know that he was only supposed to get information related to his searches, his ongoing searches? For the purposes of this, I'll concede that for the CFAA arguments. You know, the actual secrecy element, the government's lighted this, is a separate element under Chung. You have to prove actual secrecy before you get to reasonable measures or the value of the information. And in this case, Carolyn Nye has said ER 885, the pitches, I mean, source lists contain just public information. That's at 880. 885, they were disclosed during pitches. They were sold during mapping engagements. The government is quite correct. There is no specific information that these source lists were sold or mapped out in the record. The government also has to concede there is no information in the record that these three source lists were not sold or mapped out. Marlene Brisky can't say that. The government said she's speculative. She doesn't know anything about searches and search lists. We cite that in the brief. But here's the ridiculous thing. They're relying on Becky Christensen saying, well, I didn't know where else I could get them. Well, if KFI sold them to Best Buy, if it disclosed them to General Electric, of course she wouldn't know that she could call up and get them. She couldn't call up and get them. They wouldn't give it to them. But that doesn't mean it didn't happen. They offered no evidence, nor did they argue, that these things were actually secret. And I'll make one point, which is just it wasn't the government, I welcome them to respond. Becky Christensen said that the reason that David Nozel used the name David Nelson sometimes when doing searches was because he was trying to hide the fact that he had these non-compete obligations under his contract, his independent contractor contract. The first thing AUSA Perella did in rebuttal argument is say, he used the name David Nozel, and I'll cite you to the pages, there is only one reason he would use the name, I'm sorry, David Nelson, and that's because he's guilty of the conspiracy. There is no other reasonable explanation why he would use the name David Nelson. Well, there was a completely reasonable explanation. Corn Ferry had yoked him to a blatantly illegal non-compete agreement under California law, and of course he wouldn't want to get into litigation about it. He wanted to avoid it, but he was entitled to not comply with that non-compete obligation, and the Court refused to allow us to put that evidence in while allowing a non-government witness to testify that he was dishonestly breaching his contractual obligations. It either we said either keep the non-compete out entirely, no reference to it, or let us prove the invalidity to it and his right under the law to not respect it, and the Court took neither of those alternatives, and it was enormously useful to the government to label him guilty of the conspiracy simply because of things related to the non-compete agreement. Thank you. Thank you. Thank you, counsel. Thank you both for your arguments. The case will be submitted for decision, and I apologize to you if you were planning to attend Judge Conte's retirement party, which is going on now. We didn't anticipate that this would be scheduled, but I'm sure you can still make the reception. Thank you for your indulgence.
judges: Thomas, Reinhardt, McKeown